UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WASH WORLD INC.,

        Plaintiff,

        v.                          Case No. 19-C-1562

BELANGER INC., et al.,

        Defendants.

## DECISION AND ORDER DENYING WASH WORLD'S MOTION TO STRIKE THE EXPERT OPINION OF DEFOREST MCDUFF

Plaintiff Wash World, Inc. brought this action for declaratory relief against Defendant Belanger, Inc., seeking a determination that Wash World's car wash systems do not infringe U.S. Patent No. 8,602,041 (the '041 Patent), to which Belanger is the assignee and which, in general, claims an automated car wash system with various lighting components. Presently before the Court is Wash World's motion to strike the expert opinion of DeForest McDuff, Ph.D. For the following reasons, the motion will be denied.

### LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training or education" to testify in the form of an opinion or otherwise if:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Federal trial courts "are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008). In assessing the admissibility of an expert's testimony, the court's focus "must be solely on principles and methodology, not on the conclusions they generate." *Winters v. Fru-Con, Inc.*, 498 F.3d 734, 742 (7th Cir. 2007) (citation omitted). But this does not mean that simply reciting a reliable methodology opens the door to any and all conclusions. "[C]onclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). To be admissible, the conclusion must have at least some logical connection to the data on which the expert is entitled to rely. "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## ANALYSIS

Belanger has retained an expert, Dr. DeForest McDuff, to provide opinions regarding the damages to which it is entitled as a result of Wash World's alleged infringement. Dkt. No. 124-1. Dr. McDuff opined that the total damages in this case would equal lost profits plus a reasonable royalty on residual units or, in the event the fact finder determines that lost profits are inappropriate

2

or unavailable, a total reasonable royalty. *Id.* at 74. He determined a range of lost profits scenarios as well as a range of reasonable royalty scenarios and summarized them in the following table:

Table 6a:
Summary of Total Damages (May '18 to August '21)

| Capture Rate | Lost Profits | Reasonable Royalty | Total Damages |
|---|---|---|---|
| Lost profits: 20% | $5.9 million | $0.7 million | $6.5 million |
| Lost profits: 30% | $8.9 million | $0.6 million | $9.5 million |
| Lost profits: 40% | $11.7 million | $0.5 million | $12.2 million |
| Lost profits: 50% | $14.8 million | $0.4 million | $15.2 million |
| Lost profits: 60% | $17.6 million | $0.4 million | $18.0 million |
| No lost profits: Low share of system | n/a | $2.3 million | $2.3 million |
| No lost profits: High share of system | n/a | $5.4 million | $5.4 million |

*Id.* He opined that Belanger's total damages range from $6.5 million, or $10,200 per unit, up to $18.0 million, or $28,300 per unit, with a midpoint estimate indicating at least $12.2 million, or $19,200 per unit, in damages. *Id.* at 75.

Wash World asserts that the Court should strike Dr. McDuff's opinion in its entirety and exclude his testimony because his calculations for lost profits and a reasonable royalty violate the entire market value rule. It also asserts that Dr. McDuff's range of damages calculations would be unhelpful to the jury. The Court will address each argument in turn.

**A. Lost Profits**

Wash World asserts that Dr. McDuff's lost profit damages calculations violate the entire market value rule. "When a patentee seeks damages on unpatented components sold with a patented apparatus, courts have applied a formulation known as the 'entire market value rule' to determine whether such components should be included in the damage computation, whether for reasonable royalty purposes, or for lost profits purposes." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc) (internal citations omitted). The entire market value rule relates to whether a patent owner can recover lost profits for the patent owner's unpatented products that are sold along with the products that directly compete against the infringer's accused

3

products. *Id.* at 1550. Belanger asserts that Dr. McDuff did not apply the market value rule and instead apportioned his damages to the patented technology by following the *Panduit* framework. Under this standard, "a patentee is entitled to lost profits if it can establish four things: (1) demand for the patented product, (2) absence of acceptable, non-infringing alternatives to the patented product, (3) manufacturing and marketing capability to exploit the demand for the patented product, and (4) that the patentee would have made a profit if it had made the infringer's sales." *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 790 (Fed. Cir. 2019) (citing *Panduit*, 575 F.2d at 1156). Belanger contends that Dr. McDuff based his lost profit damages on the profits that Belanger earns on the Kondor and Saber products that directly compete with the accused products. Belanger is entitled to its lost profits for the entire Kondor or Saber, not just the incremental profit associated with the patented lighting system of the Kondor or Saber. *See Rite-Hite*, 56 F.3d at 1546–49 (allowing patent owner to recover lost profits for entire competitive product).

Wash World argues that Dr. McDuff's lost profit damages calculations improperly included approximately $24,000 in revenue from ancillary parts and $14,000 in profit. Dr. McDuff indicated that Belanger earned an average incremental revenue of $88,364, which includes the amount of profit that Belanger earns on the base car wash system incorporating the patented system as well as additional components that are sold with the average car wash system, such as a dryer. Dkt. No. 124-1 at 53. Wash World asserts that, by including the additional features, Dr. McDuff inflated the per-unit revenues of Belanger's products and violated the entire market value rule. Dr. McDuff explained that the additional components he factored into his incremental revenue and profit per unit calculations are sold with the average car wash system. Any challenges to Dr. McDuff's credibility, data, or factual assumptions go to the weight of the evidence, not its

4

admissibility. "Where the methodology is sound and the evidence relied upon is sufficiently related to the case, disputes over the expert's credibility or over the accuracy of the underlying facts are for the jury." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015) (citation omitted).

Wash World also asserts that Dr. McDuff's market share analysis is unreliable because it improperly relied on the estimates of David Dougherty, Piston OPW's Vehicle Wash Solutions' Director of Product Management and Marketing. Dougherty worked for both PDQ and Belanger and explained that PDQ estimated its relative market share by talking to channel partners, polling its customers, reviewing information published by the International Carwash Association, gathering information from conversations at trade shows, and gathering publicly available information about private equity transactions within the car wash industry. Dkt. No. 131-2 at 6–8. Dougherty stated that he believed Wash World and Belanger had the same size market share at 14%. *Id.* at 18–19. Dr. McDuff relied on Dougherty's estimate for PDQ in determining the market share of PDQ relative to Belanger and assigned PDQ a 59.9% market share. Although Dr. McDuff ultimately assigned Belanger and Wash World each 14% of the market share, Dr. McDuff did not rely on Dougherty's estimate in reaching his conclusion. Instead, he relied on the product historical sales of Belanger and Wash World to determine their market shares.

Wash World further asserts that Dr. McDuff's market share analysis improperly inflates Belanger's sales because it ignores 37% of other competitors in the market. It also contends that 72% of the market was made up of competitors who sold car wash systems without lighted arms. Dr. McDuff explained, however, that he only focused his analysis on Belanger, Wash World, and PDQ because Belanger and PDQ are Wash World's primary competitors in the touch-free in-bay automatic car wash market. *See* Dkt. No. 131-3 at 5–6. He stated that he evaluated the actual sales

5

data from Belanger and Wash World, information about the volume of PDQ's touch-free systems, and reviewed the competitors in the marketplace and determined that focusing on the competitors in the touch-free in-bay automatic car wash market would be a better indication of what would occur in a but-for world, rather than consider both touch-free and friction machine competitors. *Id.* at 10–11. Dr. McDuff explained that non-lighted systems and systems with overhead lighting are not non-infringing alternatives because they do not provide the same functionality and associated benefits as the patented lighted car wash system. Dkt. No. 124-1 at 39–44. Again, any disagreement Wash World may have with Dr. McDuff's opinions, data, or assumptions regarding his market share analysis may be addressed on cross-examination.

Wash World argues that Dr. McDuff relies on improper comparisons to calculate lost profits. In particular, Wash World challenges the lost profits calculations that are based upon the sale of Belanger's two-armed wash systems. Because Wash World only sells one-armed in-bay automatic car wash systems, Wash World asserts that Dr. McDuff should have limited his lost profits analysis to Belanger's one-armed system. Belanger counters that, because Wash World only offers one-armed in-bay automatic car wash systems, "there is no way to know" whether a hypothetical Wash World customer would have preferred and purchased a one-arm or two-arm Belanger in-bay automatic car wash system. Dkt. No. 130 at 44. In his report, Dr. McDuff noted that the difference between a one-armed and two-armed system was $1,500 in terms of revenue and $300 in terms of profits. Dkt. No. 124-1 at 96. As a result, Dr. McDuff calculated the amount of Belanger's incremental profit by assuming that an equal number of customers would buy a Belanger one-armed in-bay automatic car wash system and a two-armed in-bay automatic car wash system. *Id.* Any criticism to the reasonableness of Dr. McDuff's assumptions may be addressed by cross-examination at trial. *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("The

question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (citation omitted)).

Wash World asserts that the projected lost profit calculations are unreliable because the Saber is no longer available for sale by Belanger. Dr. McDuff indicated that the fact that the Saber is no longer available does not change his analysis. He explained that the sales data over time showed predominant sales of the Kondor product and declining sales of the Saber product. Dkt. No. 144-1 at 3. In other words, Dr. McDuff explained that his analysis takes into account the volume of Kondor and Saber products on the market and as a result the discontinuation of the Saber would not affect the amount of damages in a "meaningful way one way or the other." *Id.* at 4. While Dr. McDuff's explanation for his conclusion may be thin, the Court concludes that it is not so weak as to compel rejection of his testimony. In sum, the Court will not exclude Dr. McDuff's lost profits testimony.

**B. Reasonable Royalty**

Wash World asserts that Dr. McDuff has improperly employed an entire market value analysis in calculating a reasonable royalty when the rule does not apply. The entire market value rule requires a patentee to introduce evidence "tending to separate or apportion the [alleged infringer's] profits and the patentee's damages between the patented feature and unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015). Under the entire market value rule,

> even when the accused infringing product is the smallest salable unit, the patentee must do more to estimate what portion of the value of that product is attributable to

the patented technology if the accused unit is a multi-component product containing several non-infringing features with no relation to the patented feature.

*Id.* (internal quotation marks omitted).

Belanger contends that Dr. McDuff properly apportioned between the patented and unpatented features using the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), without relying on the entire market value rule. Belanger's patent is directed to an improved in-bay automatic car wash system, not the lighted spray arm. Thus, Dr. McDuff opined that the royalty amount he determined "is economically and reasonably based on apportioned sales of the car wash system, as opposed to being limited to the lighted arm system only." Dkt. No. 124-1 at 63. Dr. McDuff acknowledged the valuable features of traditional in-bay automatic car wash systems without the patented technology. He employed the *Georgia-Pacific* factors and incorporated those apportionment principles in his analysis. *Id.* at 64–73. Dr. McDuff then calculated a per unit royalty, rather than a royalty based on the sales price of the accused products. Wash World's arguments regarding Dr. McDuff's apportionment analysis bear on the weight to be given to his testimony, not its admissibility.

### C. Range of Damage Calculations

Wash World asserts that Dr. McDuff's opinions should be excluded because the range of damages contained in his report would not be helpful to a jury. Dr. McDuff's report lists five lost profits scenarios ranging from $5,871,342 to $17,614,027 and a number of reasonable royalty rates. The Federal Circuit has recognized that "estimating a reasonable royalty is not an exact science." *Summit 6*, 802 F.3d at 1296. "The record may support a range of reasonable royalties, rather than a single value." *Id.* Dr. McDuff has provided a range of damages amounts to assist the jury in assessing the appropriate amount of damages based on the value of the patented

technology. Dr. McDuff's recommendations are supported by the record; therefore, he may testify about his damages conclusions.

Wash World also argues that Dr. McDuff provides no guidance for the jury to determine the appropriate capture rate or percentage of sales Belanger would have captured. Dr. McDuff stated that he presented a "range of Belanger capture rates, from 20% on the low end up to 60% on the high end, based on considerations such as the fact that Belanger and Wash World have overlapping customers and compete in the same geography, customer desire for the car wash systems, and the emphasis of the lighting system in the parties' marketing materials. Dkt. No. 124-1 at 48–49, 52. Dr. McDuff provided a reasonable explanation for his conclusion in this regard. In short, his opinions will not be excluded.

## CONCLUSION

For these reasons, Wash World's motion to strike the expert opinion of DeForest McDuff (Dkt. No. 122) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of July, 2021.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge