# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

WASH WORLD INC.,

     **Plaintiff,**

    **v.**

BELANGER, INC.,
PISTON OPW, INC. D/B/A OPW, INC.,

     **Defendants.**

**Case No. 1:19-cv-01562-WCG**

████████████████████
████████████████████

## BELANGER, INC.'S CONSOLIDATED MEMORANDUM
## IN SUPPORT OF ITS MOTIONS FOR ENHANCED DAMAGES, ATTORNEY FEES,
## AND PREJUDGMENT INTEREST

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     THE JURY CONTEMPLATED ADDITIONAL DAMAGES BEING
        ASSESSED AGAINST WASHWORLD ............................................................1

III.    THE COURT SHOULD TREBLE THE DAMAGES AWARD ......................2

        A.      The Purpose of Enhanced Damages Is to Punish and Deter .................2

        B.      WashWorld's Willful Conduct Warrants Enhanced Damages ............4

        C.      The *Read* Factors Warrant Enhanced Damages.................................5

                1.      Whether the infringer deliberately copied the ideas or
                        design of another................................................................5

                2.      Whether the infringer, when it knew of the other's
                        patent protection, investigated the scope of the patent
                        and formed a good-faith belief that it was invalid or that
                        it was not infringed ..............................................................7

                3.      The infringer's behavior as a party to the litigation................11

                        a.      WashWorld repeatedly changed its non-
                                infringement arguments .........................................11

                        b.      WashWorld withheld discovery, necessitating
                                multiple motions to compel ....................................14

                        c.      WashWorld's unreasonable positions resulted in
                                unnecessary motion practice ...................................16

                4.      The infringer's size and financial condition ...........................19

                5.      Closeness of the case ..........................................................20

                6.      Duration of the infringer's misconduct...................................23

                7.      Remedial action by the infringer............................................24

                8.      The infringer's motivation for harm .......................................25

                9.      Whether the infringer attempted to conceal its
                        misconduct .........................................................................25

i

IV.   THIS IS AN EXCEPTIONAL CASE AND THE COURT SHOULD AWARD BELANGER ITS ATTORNEY FEES UNDER 35 U.S.C. § 285........................................................................................................26

    A.   This Case Is Exceptional Because the Jury Found It To Be Exceptional ..........................................................................27

    B.   A Finding of Willfulness Warrants an Award of Attorney Fees ........................27

    C.   WashWorld's Liability Defenses Were Exceptionally Weak.............................28

    D.   WashWorld's Litigation Tactics Needlessly Increased Costs ............................28

    E.   Belanger Should Be Awarded $1,884,847.....................................29

V.   THE COURT SHOULD AWARD PREJUDGMENT INTEREST ...............................29

VI.   CONCLUSION..........................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Amsted Industries Inc. v. Buckeye Steel Castings Co.*,
No. 91 C 1179, 1993 WL 96517 (N.D. Ill. Mar. 31, 1993) ....................................7, 11, 19, 26

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*,
853 F.2d 1557 (Fed. Cir. 1988)...........................................................................................3

*Cambrian Science Corp. v. Cox Communications, Inc.*,
79 F. Supp. 3d 1111 (C.D. Cal. 2015) ...............................................................................28

*Cognex Corp. v. Microscan Systems, Inc.*,
No. 13-cv-2027 (JSR), 2014 WL 2989975 (S.D.N.Y. June 30, 2014)...................................28

*Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*,
No. 16 CV 3676, 2020 WL 4723980 (N.D. Ill. July 13, 2020) .............................................27

*EagleView Technologies, Inc. v. Xactware Solutions, Inc.*,
522 F. Supp. 3d 40 (D.N.J. 2021) ................................................................................ *passim*

*General Motors Corp. v. Devex Corp.*,
461 U.S. 648 (1983).............................................................................................................29

*Georgetown Rail Equipment Co. v. Holland L.P.*,
No. 6:13-CV-366, 2016 WL 3346084 (E.D. Tex. June 16, 2016) ...................................27, 29

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
355 F.3d 1327 (Fed. Cir. 2004)..........................................................................................27

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
579 U.S. 93 (2016)........................................................................................................2, 3, 4

*Linex Technologies, Inc. v. Hewlett-Packard Co.*,
No. C 13-159 CW, 2014 WL 4616847 (N.D. Cal. Sept. 15, 2014)........................................28

*Liquid Dynamics Corp. v. Vaughan Co.*,
No. 01 C 6934, 2005 WL 711993 (N.D. Ill. Mar. 22, 2005) ..................................................10

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (*en banc*) ...........................................................................9, 21

*Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.*,
726 F.3d 1359 (Fed. Cir. 2013)...........................................................................................28

*Monsanto Production Supply LLC v. Rosentreter*,
No. 3:16-CV-03038, 2017 WL 4284566 (C.D. Ill. Sept. 27, 2017) .........................5, 6, 24, 26

iii

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
572 U.S. 545 (2014)..................................................................................................2, 27

*Oplus Technologies, Ltd. v. Vizio, Inc.*,
782 F.3d 1371 (Fed. Cir. 2015)..............................................................................29

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................8, 13, 21

*Pure Fishing, Inc. v. Normark Corp.*,
No. 10-cv-2140-CMC, 2014 WL 5474589 (D.S.C. Oct. 28, 2014).......................29

*R-BOC Representatives, Inc. v. Minemyer*,
233 F. Supp. 3d 647 (N.D. Ill. 2017) ..................................................6, 24, 25, 26

*Read Corp. v. Portec, Inc.*,
970 F.2d 816 (Fed. Cir. 1992)........................................................................ *passim*

*ReedHycalog UK, Ltd. v. Diamond Innovations Inc.*,
No. 6:08-CV-325, 2010 WL 3238312 (E.D. Tex. Aug. 12, 2010)...................19, 25

*In re Seagate Technology, LLC*,
497 F.3d 1360 (Fed. Cir. 2007) (*en banc*) ...........................................................4, 8

*Smith v. Snow*,
294 U.S. 1 (1935).................................................................................................9, 21

*SRI Int'l, Inc. v. Advanced Technology Laboratories, Inc.*,
127 F.3d 1462 (Fed. Cir. 1997).........................................................................2, 21

*SRI Int'l, Inc. v. Cisco Systems, Inc.*,
14 F.4th 1323 (Fed. Cir. 2020) ...............................................................................27

*SRI Int'l v. Matsushita Electric Corp. of America*,
775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) ..............................................................8

*Stryker Corp. v. Zimmer, Inc.*,
No. 1:10-CV-1223, 2017 WL 4286412 (W.D. Mich. July 12, 2017)...................11, 13, 25, 26

*T&M Inventions, LLC v. Acuity Brands Lighting, Inc.*,
No. 14-C-947, 2016 WL 7441650 (E.D. Wis. Dec. 27, 2016) (Griesbach, J.).......................29

*WCM Industries, Inc. v. IPS Corp.*,
809 F. App'x 957 (Fed. Cir. 2020) ...........................................................................3

*Wisconsin Alumni Research Foundation v. General Electric Co.*,
880 F. Supp. 1266 (E.D. Wis. 1995).......................................................................30

iv

**Statutes**

35 U.S.C. § 112 .................................................................................................................... 21

35 U.S.C. § 284 .......................................................................................................... 1, 2, 30

35 U.S.C. § 285 .......................................................................................................... 1, 2, 26

**Other Authorities**

Fed. R. Civ. P. 37(c)(2) ...................................................................................................... 15

# I. INTRODUCTION

"No big deal."

This is what Pete Jensen, WashWorld's President, was overheard to say in the courtroom hallway following the jury verdict finding WashWorld to have willfully infringed Belanger's '041 patent and awarding Belanger $10,060,000 in damages. In finding willful infringement, the jury concluded that WashWorld "acted in reckless disregard of Belanger's rights." The jury's decision on willfulness was not a close call—they sent a note asking about a "cease and desist" order to stop WashWorld's continuing infringement, and asking for WashWorld to reimburse Belanger for its "lawyer fees," "court costs," "professional witness fees," and "consultants." After reading the verdict, the Court indicated it was likely to grant Belanger's requested injunction. It was a "big deal" for the jury to find WashWorld willfully infringed Belanger's patent. However, that message was not received by WashWorld.



Now is the time to address the "additional charges to WashWorld" that the jury contemplated and the Court said it would address after the verdict. This combined memorandum addresses three separate motions seeking to enhance the damages award for WashWorld's willful infringement of the '041 patent under 35 U.S.C. § 284, award Belanger its attorney fees under 35 U.S.C. § 285, and award Belanger prejudgment interest.

# II. THE JURY CONTEMPLATED ADDITIONAL DAMAGES BEING ASSESSED AGAINST WASHWORLD

In addition to its award of lost profit and reasonable royalty damages, the jury contemplated entry of an injunction (which has occurred) and additional charges to WashWorld for Belanger's

1

attorney fees, court costs, professional witness fees, and consultants. Dkt. 223-1. While a jury may not assess these additional costs, the Court can and should tax these costs of litigation against WashWorld.

Belanger seeks its attorney fees pursuant to 35 U.S.C. § 285 and separately seeks $36,414.33 in taxable costs. But an award of fees and taxable costs alone will not make Belanger whole or pay Belanger's professional witness fees, consultants, and other non-taxable costs, which total more than $450,000. The Court should treble the jury's damages award under 35 U.S.C. § 284 to punish WashWorld for its willful conduct and deter future infringement.

## III. THE COURT SHOULD TREBLE THE DAMAGES AWARD

### A. The Purpose of Enhanced Damages Is to Punish and Deter

Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Although enhancement is discretionary and "there is 'no precise rule or formula' for awarding damages under § 284," the Supreme Court has instructed that a district court's "'discretion should be exercised in light of the considerations' underlying the grant of that discretion." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103 (2016) (quoting *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Awards of enhanced damages "are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Id.* "The sort of conduct warranting enhanced damages has been variously described in [Supreme Court] cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or— indeed—characteristic of a pirate." *Id.* at 103–04.

Enhanced damages serve as a deterrent for future conduct. *SRI Int'l, Inc. v. Advanced Technology Laboratories, Inc.*, 127 F.3d 1462, 1468 (Fed. Cir. 1997) ("When willful infringement or bad faith has been found, the remedy of enhancement of damages not only serves its primary

2

punitive/deterrent role, but in so doing it has the secondary benefit of quantifying the equities as between patentee and infringer."); *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1566 (Fed. Cir. 1988) ("One purpose of an increased damage award is to deter willful patent infringement by punishing the willful infringer."), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008).

In considering whether to enhance damages, courts must "take into account the particular circumstances of each case" (*Halo*, 579 U.S. at 106), and many courts have found the factors enumerated in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)[1], to be instructive. *See WCM Industries, Inc. v. IPS Corp.*, 809 F. App'x 957, 958 n.1 (Fed. Cir. 2020) ("[T]hough the nine factors discussed in *Read* are not mandatory, they may assist the trial court in deciding whether damages should be enhanced at all, and if so, by how much.").

In particular, as explained in *Read*, "[t]he paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the [infringer's] conduct based on all the facts and circumstances." *Read*, 970 F.2d at 826. Citing to numerous authorities, the *Read* court identified the following nine illustrative and non-exhaustive factors that courts may consider when deciding enhanced damages (*id*. at 827):

> (1) Whether the infringer deliberately copied the ideas or design of another;
>
> (2) Whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;
>
> (3) The infringer's behavior as a party to the litigation;
>
> (4) The infringer's size and financial condition;
>
> (5) Closeness of the case;

---

[1] *Abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

3

(6) Duration of the infringer's misconduct;

(7) Remedial action by the infringer;

(8) The infringer's motivation for harm; and

(9) Whether the infringer attempted to conceal its misconduct.

## B.      WashWorld's Willful Conduct Warrants Enhanced Damages

As the Supreme Court held in *Halo*, "[s]ection 284 permits district courts to exercise their discretion in a manner free from the inelastic constraints of the *Seagate* test. Consistent with nearly two centuries of enhanced damages under patent law, however, ***such punishment should generally be reserved for egregious cases typified by willful misconduct***." *Halo*, 579 U.S. at 106.[2] "The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed— characteristic of a pirate." *Id.* at 103–04.

Here, the jury correctly found that WashWorld engaged in willful misconduct. Dkt. 223 at 2. WashWorld pirated Belanger's innovation and sold it as its own. In making its willfulness finding, the Court instructed the jury to consider "evidence regarding whether Wash World acted maliciously, deliberately, or in bad faith." Dkt. 222 at 18. From the jury's finding of willfulness, the Court can infer that the jury did find that WashWorld acted maliciously, deliberately, and/or in bad faith, and under *Halo*, that finding is enough to warrant enhanced damages.

As set forth below, the jury's finding reflects some—but by no means all—of the actions of WashWorld that make this an egregious case warranting trebling of the damages award.

---

[2] Emphasis added and all internal citations and quotations omitted unless otherwise noted.

4

## C. The *Read* Factors Warrant Enhanced Damages

The *Read* factors provide a framework for analyzing whether enhanced damages are warranted, and they strongly point towards an award of treble damages here.

### 1. Whether the infringer deliberately copied the ideas or design of another

Deliberate copying of "the ideas or design" of the patent owner weighs in favor of enhancement. *Read*, 970 F.2d at 827; *Monsanto Production Supply LLC v. Rosentreter*, No. 3:16-CV-03038, 2017 WL 4284566, at *5 (C.D. Ill. Sept. 27, 2017). As *Read* explained, "'ideas and design' would encompass, for example, copying the commercial embodiment, not merely the elements of a patent claim." *Read*, 970 F.2d at 827 n.7.

WashWorld's witnesses testified they knew about Belanger's patented products and considered them while designing the LumenArch. They then launched the LumenArch as their "NEW INVENTION." This unauthorized copying of Belanger's patented product is the very definition of a pirate. WashWorld began designing its LumenArch in 2017 (Trial Tr. at 576:2–4) and knew about Belanger's products for several years beforehand. Belanger's Saber with an illuminated spray arm had been on the market since 2010. *Id.* at 119:14–22. Richard Andreas testified that WashWorld knew about Belanger's Kondor and Saber products, saw them at trade shows, and looked at information about them on the internet. *Id.* at 398:5–19. He testified that in 2016 he knew Belanger had patents covering the lighted spray arm. *Id.* at 400:5–8.

WashWorld deliberately copied Belanger's illuminated spray arm. WashWorld designed the LumenArch in response to customers' and distributors' requests for more lighting in the wash bay. Trial Tr. at 576:5–8. Jeffrey Martin, WashWorld's Director of Operations and Engineering, testified that WashWorld discussed Belanger's products when it was designing the LumenArch.

> Q. At the time that Wash World began designing the LumenArch, Wash World had seen a Belanger product that had lighting on the spray arm of an in-bay automatic car wash; isn't that right?

5

A. Yes.

Q. And that Belanger product was part of your discussion when you were first considering how to add lights to your Razor product, correct?

A. Yes.

*Id.* at 580:1–8.

In designing the LumenArch, WashWorld was motivated by its customers' interest in more lighting and its consideration of Belanger's products, as Mr. Martin testified: "And you mentioned one of your motivators was to create a Wash World light show in the bay; is that right? Answer. Yes. Going back to what other customers have asked us for ***and what we've seen some competitors do as well***." Trial Tr. at 579:6–9. In contrast to Oasis (*id*. at 134:3–20) and PDQ (*id.* at 176:4–13), who each considered bringing a lighted spray arm to market but decided against doing so because of Belanger's patent, WashWorld deliberately copied the Kondor and Saber with no regard for Belanger's patent.



Rather than compete on its own innovations, WashWorld deliberately copied one of Belanger's key differentiating features—its illuminated spray arm—and claimed it as its own "NEW INVENTION." *See* Twitter post (right); Trial Ex. 1611. WashWorld's piracy warrants a trebling of damages. *See, e.g.*, *Monsanto*, 2017 WL 4284566, at *5 (awarding treble damages where the infringer "knew of the patent protection" and copied the patentee's technology); *R-BOC Representatives, Inc. v. Minemyer*, 233 F. Supp. 3d 647, 683, 689 (N.D. Ill. 2017) (awarding treble damages where the infringer "deliberately and slavishly

6

copied" the patentee's product), *aff'd*, 726 F. App'x 821 (Fed. Cir. 2018); *Amsted Industries Inc.*

*v. Buckeye Steel Castings Co.*, No. 91 C 1179, 1993 WL 96517, at *2 (N.D. Ill. Mar. 31, 1993)

(awarding treble damages where the infringer "intentionally copied the patented article"), *aff'd in*

*relevant part*, 24 F.3d 178 (Fed. Cir. 1994).

2.      **Whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed**

*Read* Factor 2 poses the question of "whether the infringer, when he knew of the other's

patent protection, investigated the scope of the patent and formed a good-faith belief that it was

invalid or that it was not infringed." *Read*, 970 F.2d at 827. WashWorld did none of these things.

Initially, WashWorld ignored Belanger's '041 patent. WashWorld's witnesses testified

that WashWorld knew Belanger had patents covering the lighting for its Kondor and Saber

products (Trial Tr. at 398:20–399:7) and its illuminated spray arm (*id.* at 400:5–8), and knew

Belanger had enforced its patent related to the illuminated spray arm against Oasis (*id.* at 398:8–

400:4), but WashWorld did not ask its patent counsel to conduct a patent search before it launched

the LumenArch (*id.* at 581:9–15). WashWorld's president testified that WashWorld has outside

patent counsel (*id.* at 527:1–7), has its own patents (*id.* at 530:16–18), thinks patents are important

(*id.* at 530:22–531:1), does not license its patents (*id.* at 531:2–4), and wants other companies to

respect its patents (*id.* at 531:5–12). This is not a situation where a company does not understand

patents. WashWorld understands patents, and it played by two sets of rules—WashWorld wants

others to respect its patents, while it ignored Belanger's patent.

WashWorld recklessly disregarded Belanger's patent rights and launched its copycat

product without concern for whether it infringed Belanger's patent. Once notified by Belanger of

its infringement, it did not modify or stop selling its product; and it did not obtain an objective

opinion of counsel regarding its infringement. WashWorld continued to act unreasonably.

7

WashWorld asserted it reasonably relied on the non-infringement arguments crafted by its attorney, but the jury correctly found that WashWorld's reliance on its counsel was not reasonable. The jury was instructed that it "must evaluate whether the opinion was of a quality that reliance on its conclusions was reasonable." Dkt. 222 at 17. The jury rejected WashWorld's defense.

Joe Heino's August 15, 2018, letter (Trial Ex. 2016) was not an opinion of counsel. A true opinion of counsel is an objective assessment of the client's risk of infringing a patent. *In re Seagate Technology, LLC*, 497 F.3d 1360, 1373 (Fed. Cir. 2007) (*en banc*) (describing opinion counsel as "serv[ing] to provide an objective assessment for making informed business decisions" and "competent legal opinion of non-infringement or invalidity which qualif[ies] as 'due care' before undertaking any potentially infringing activity"), *abrogated on other grounds by Halo*, 579 U.S. 93. The Heino letter was not objective. It did not explain the strengths and weaknesses of Belanger's assertion that WashWorld infringed the '041 patent. Instead, it was an after-the-fact advocacy piece sent to convince Belanger to go away.

Despite its length, the Heino letter has very little discussion concerning non-infringement, less than two of the twenty pages. For claim 7, the letter lists a single non-infringement defense.

The letter claims the Razor EDGE does not have a cushioning sleeve because a cushioning sleeve must be made of foam; however, reading this "foam" limitation into claim 7 violates basic principles of patent law, which have been repeatedly emphasized in Supreme Court and Federal Circuit cases. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319–20 (Fed. Cir. 2005) (**en banc**) (noting that "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law"); *SRI Int'l v. Matsushita Electric Corp. of America*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (**en banc**) ("[T]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims. If everything in the

specification were required to be read into the claims, . . . there would be no need for claims."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (**en banc**) ("[T]he specification itself does not delimit the right to exclude. That is the function and purpose of claims."), *aff'd*, 517 U.S. 370 (1996); *Smith v. Snow*, 294 U.S. 1, 11 (1935) (An inventor "is not confined to that particular mode of use [described in the specification], since the claims of the patent, not its specifications, measure the invention."). The Heino letter does not discuss the risks associated with this legally untenable claim construction position. In his private correspondence with his client, Mr. Heino admitted that the Razor EDGE has a "protective" sleeve—which is what the Court said is the plain and ordinary meaning of the term "cushioning". Dkt. 109 at 10 ("i.e., cushion ('to protect against force or shock')").

Mr. Heino also did not identify any prior art defense to claim 7, and though he threatened Belanger with an *inter partes* review (IPR) to challenge the validity of the patent, WashWorld never took steps to file an IPR. Indeed, in this litigation, WashWorld dropped its prior art invalidity defenses—when its expert would not support them. *See* Ex. 1, Rice Invalidity Report at ¶ 34 (stating he was asked to consider whether the patent was obvious or anticipated, and then not addressing obviousness or anticipation in the report).[3]

WashWorld's internal communications show that the Heino letter was not objective. Internal memoranda show that Mr. Heino harbored concerns about the positions he put in his letters to Belanger. He admitted the LumenArch had a "protective sleeve." Trial Ex. 1632 at 4 ("Belanger is attempting to equate the arch cover of the LumenArch™ arm with a "cushioning" sleeve. It is a protective sleeve . . . ."). He said that "Claim 15 gives us a little heartburn." Trial Ex. 1639 at

---

[3] Exhibits to this consolidated memorandum are attached to the Declaration of Christopher R. Dillon in Support of Belanger, Inc.'s Consolidated Memorandum in Support of its Motions for Enhanced Damages, Attorney Fees, and Prejudgment Interest filed concurrently herewith.

9

WW003866; Trial Tr. at 661:12–18. And his colleague, Ms. Kaprelian, questioned whether they had support for their argument that the Razor EDGE did not have a wash area: "Do we have anything to support this?" Trial Ex. 1632 at 2. The Heino letter was not an objective opinion of counsel; it was an advocacy piece.

Internal correspondence shows that the purpose of the letter was to intimidate Belanger. Mr. Heino noted ███████████████████████████████████████████ ████████████████████████████████████████ Ex. 1639 at WW003880 (not admitted at trial). He characterized the purpose of his initial July 2018 response as ████████████ ███████████████████████████████████████████████████████ ████████████████████████ *Id.* at WW003881. And the letter's lengthy discussion of the file history was included ████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████ *Id.* at WW003866.

WashWorld argued that it reasonably relied on Mr. Heino's advice, but the jury rejected that argument and concluded that WashWorld acted willfully. In doing so, it rejected WashWorld's argument that its after-the-fact reliance on the advice of counsel was reasonable. WashWorld knew of Belanger's patent rights, initially failed to investigate the scope of the patent, and later unreasonably relied on its attorney's advocacy and argument rather than an objective, good-faith belief that the patent was invalid or that it was not infringed. *See, e.g.*, *Liquid Dynamics Corp. v. Vaughan Co.*, No. 01 C 6934, 2005 WL 711993, at *2 (N.D. Ill. Mar. 22, 2005) (finding that, because the jury found willful infringement, "[p]resumably, the jury disregarded [the infringer's patent attorney's] testimony [concerning his non-infringement opinion], resolved credibility determinations in [the patentee's] favor, and rejected [the infringer's] good faith

defense," and awarding treble damages), *aff'd*, 449 F.3d 1209 (Fed. Cir. 2006); *Amsted*, 1993 WL 96517, at *2 (awarding treble damages where the infringer "advanced the defense of reliance on opinion of counsel to the jury" and "the jury did not find for" the infringer).

### 3. The infringer's behavior as a party to the litigation

Throughout this litigation, WashWorld took unreasonable positions that increased the cost to litigate. There are three general categories of conduct that unnecessarily drove up the cost of the litigation: WashWorld's changing non-infringement arguments; WashWorld's refusal to produce the basic financial and technical documents that are routinely produced in patent infringement cases; and unnecessary motion practice arising from WashWorld's unreasonable positions. *See, e.g.*, *EagleView Technologies, Inc. v. Xactware Solutions, Inc.*, 522 F. Supp. 3d 40, 51 (D.N.J. 2021) (finding that this factor "significantly favors enhanced damages" where the infringer "repeatedly acted in a manner that ignored the weaknesses of their own arguments, increased [the patentee's] costs, and prolonged the litigation," and awarding treble damages); *Stryker Corp. v. Zimmer, Inc.*, No. 1:10-CV-1223, 2017 WL 4286412, at *4 & n.5 (W.D. Mich. July 12, 2017) (finding that "the third factor favored enhancement" where the infringer "needless[ly] delay[ed] in producing key documents" and "many of [the infringer's] positions throughout the litigation were unjustified, resulting in the unnecessary prolonging of litigation," and awarding treble damages), *aff'd*, 745 F. App'x 167 (Fed. Cir. 2018).

### a. WashWorld repeatedly changed its non-infringement arguments

WashWorld repeatedly changed its non-infringement arguments—later contesting elements it had previously admitted were present. Instead of conceding defeat after the Court issued its claim construction ruling—or admitting infringement under the Court's order and appealing the order—WashWorld flip-flopped positions and began asserting its products lacked

11

claim elements that it previously admitted were present. In doing so, it contradicted its verified interrogatory response and its 30(b)(6) testimony.

At trial, WashWorld argued the infringing products were missing three elements of claim 7; yet, it had previously admitted in its non-infringement contentions and 30(b)(6) deposition testimony that two of the three were present in its product. In a June 29, 2018, interrogatory response, verified by WashWorld's president (Trial Ex. 1129 at 4, incorporating Trial Ex. 1126), "Washworld acknowledges that the Relevant Products include th[ese] structure[s]": "a carriage for translating a vertically oriented spray arm relative to a predefined wash area" and "wherein the vertically oriented spray arm is dependingly mounted from the carriage so as to extend substantially vertically into the wash area for controlled travel relative to a vehicle in the area." Trial Ex. 1126 at 6–7. WashWorld confirmed its position in the 30(b)(6) depositions of both Mr. Martin and Mr. Andreas—both of whom were confronted with their prior inconsistent testimony at trial: Martin (Trial Tr. at 595:7–597:17) and Andreas (*id.* at 671:5–12, 673:20–24).

WashWorld changed its position after the close of discovery and after Belanger served its expert report. WashWorld did not change its position because of the Court's claim construction ruling, which said each term should be given its plain and ordinary meaning and did not create any new non-infringement arguments. WashWorld changed because the Court rejected its proposed narrow claim construction positions, and WashWorld stubbornly refused to admit infringement. So it came up with new arguments—and in doing so contradicted its prior admissions.

WashWorld also changed its position regarding "cushioning sleeve." Originally, WashWorld argued it did not have a cushioning sleeve because its black foam insert did not enclose the fluid conduit and lights. WashWorld sought to have the term "cushioning sleeve" construed to require a sleeve made of foam. Dkt. 109 at 9. WashWorld's attorneys, including Mr. Heino

and Ms. Coley, knew (or should have known) that this construction was wrong because, as discussed above, it is black letter patent law (*supra* at 8–9) that you cannot read a limitation from an example in the specification into the claims. *See, e.g.*, *Phillips*, 415 F.3d at 1319–20 (noting that "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law"). The Court rejected WashWorld's proposed construction and said the plain and ordinary meaning of the term applied, which is "to protect against force or shock." Dkt. 109 at 10.

Mr. Heino had told WashWorld before it filed this litigation that the LumenArch had a protective sleeve. Yet, even after it lost claim construction, WashWorld continued to argue it did not infringe. At trial, WashWorld did not present any testimony that a person of skill in the art would find there was no protective sleeve. One of its witnesses tried to argue that the sleeve did not protect the spray arm or the car (Trial Tr. at 566:8–9, 566:20–25, 567:5–7), despite the fact WashWorld promoted the protective nature of the sleeve. Trial Ex. 2012 (video showing spray arch cover hitting a bike rack at 1:08). The jury rejected WashWorld's argument.

WashWorld's refusal to concede infringement (or to admit infringement under the Court's construction and immediately appeal the claim construction decision) resulted in another unnecessary year of litigation, and another year of lost profits and damages to Belanger as a result of WashWorld's infringement. WashWorld's conduct supports enhanced damages. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 51 (finding that this factor "significantly favors enhanced damages" where the infringer "prolonged the litigation"); *Stryker*, 2017 WL 4286412, at *4 & n.5 (finding that "the third factor favored enhancement" where "many of [the infringer's] positions throughout the litigation were unjustified, resulting in the unnecessary prolonging of litigation").

13

### b. WashWorld withheld discovery, necessitating multiple motions to compel

WashWorld refused to produce the basic financial and technical documents that are routinely produced in patent infringement cases (often by local rule even without formal discovery being served), forcing Belanger to file a motion to compel production of these documents. Dkt. 28, 29. WashWorld refused to produce fundamental technical documentation regarding the operation of its products (RFP Nos. 13–17); basic financial information for its sales of the accused products, such as cost and profit data (RFP Nos. 36, 38, 45, 50–51); its internal strategy documents regarding the market and customer demand for the accused products (RFP Nos. 39–44); and the names of its customers (RFP Nos. 34–35 and 37). Dkt. 28, 29. The Court granted Belanger's motion and directed WashWorld "to consult with the defendants and to produce more, to use their protective order to protect them from additional discovery, and specifically to produce more of the financial information that's required." Dkt. 70 (2020-10-05 Hr'g Tr.) at 22:16–20; Dkt. 64.

WashWorld also refused to admit basic aspects of how its product worked, forcing Belanger to file another motion to compel proper responses to Belanger's requests for admissions. Dkt. 43, 44. Belanger sought to narrow the infringement issues so the Court would only have to construe claim terms that genuinely were in dispute. The RFAs largely addressed claim elements for which WashWorld's non-infringement contentions had already conceded the structures were present. However, WashWorld denied all but one RFA. WashWorld even denied that the Razor EDGE wash system comprises a spray-type washer for vehicles. Ex. 1138 at RFA No. 1.

At the motion hearing on October 5, 2020, the Court instructed the parties to consult with one another and narrow the issues by admitting to facts that were not in dispute. Dkt. 70 at 22:5–9; *see also* Dkt. 64. But although WashWorld was now willing to admit it had a spray type washer, it gave few other concessions in its amended responses. Even after the Court's instruction that

14

WashWorld "admit[] to facts and interpretations that aren't in dispute" (Dkt. 70 at 22:5–9),

WashWorld continued to deny basic functions of how its wash system operated, including:

> Denied that the RAZOR® Edge wash system comprises a rail system extending longitudinally over a wash bay. (3)

> Denied that the spray arm of the RAZOR® Edge wash system extends substantially vertically into the wash bay. (7)

> Denied that the travel of the spray arm of the RAZOR® Edge wash system is controlled relative to a vehicle in the wash bay. (8)

> Denied that the spray arm of the RAZOR® Edge wash system comprises a fluid conduit and a plurality of vertically spaced nozzles for directing fluids laterally of the arm toward a vehicle in the wash bay. (9)

> Denied that the LumenArch™ comprises a plurality of light sources carried by the arm and distributed along substantially the entire vertical length of the arm. (16)

> Denied that the light sources of LumenArch™ provide illumination visible to a vehicle driver entering the RAZOR® Edge wash system. (19)

Ex. 2 (2020-11-09 Responses to Revised First Set of RFAs). As a result, Belanger had to spend time at trial proving the WashWorld products performed the basic functions of a car wash. Fed. R. Civ. P. 37(c)(2) ("If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof.").

Belanger asked WashWorld to produce its source code and a sample light strip because they were the best evidence of how the accused products can be programmed to operate and whether the lights were connected in series, in parallel, or both, respectively. Dkt. 29 at 5; Dkt. 44 at 3. WashWorld refused to produce its source code for its control system requiring two separate motions to compel. Dkt. 28, 29; Dkt. 72 at 3 ("Even though the Court previously instructed WashWorld to produce its source code if the comments were insufficient, WashWorld has

represented that it will not produce its source code absent Court order."). WashWorld also objected to providing a sample light strip on the basis that Belanger's request was untimely—even though Belanger made the request promptly after WashWorld raised a new non-infringement argument regarding the electrical connections on the light strip. Dkt. 44 at 3; Dkt. 72. at 3. WashWorld argued the source code and light strip were irrelevant, and the Court accepted WashWorld's representation. Dkt. 90 at 8–9.

However, after representing to the Court that the source code and light strip were irrelevant, WashWorld later tried to advance arguments that would have been disproved by both the source code and the light strip, such as whether the control system activated the lighting system upon entry and whether the lights were serially connected. WashWorld even sought to introduce a light strip at trial (Trial Tr. at 493:16–22) and intended to call Michael Close, representing in opening that "Mr. Close is the one that has written all the programming code" (*id*. at 6–7)—despite its earlier arguments that the light strip and source code were irrelevant, and despite filing a motion *in limine* seeking to exclude testimony regarding the source code and light strip. Dkt. 159-1 (WashWorld's Motion *in Limine* No. 7).

### c. WashWorld's unreasonable positions resulted in unnecessary motion practice

Throughout this litigation, WashWorld took unreasonable positions that took time and cost to address. WashWorld filed motions that had no chance of success and refused to back down from unreasonable positions without Belanger having to file a motion.

### i. WashWorld asserted claims against Dover Corporation without any basis and refused to dismiss the claims

In its declaratory judgment complaint, WashWorld asserted claims against Belanger's parent, Dover Corporation, without any basis. Dkt. 1. Dover represented that it did not own the '041 patent and had no standing to assert the patent against WashWorld. But WashWorld refused

16

to voluntarily dismiss the claims against Dover. Belanger had to file a motion to dismiss Dover from the case (Dkt. 12), which the Court granted (Dkt. 22). WashWorld had no colorable argument as to how Dover could be a proper party in this lawsuit.

### ii.  WashWorld refused to drop its defenses that were inconsistent with the Court's claim construction order

After the Court issued its claim construction decision (Dkt. 109), several of WashWorld's defenses were no longer viable. WashWorld refused to voluntarily drop these defenses, which required Belanger to file two different motions. First, Belanger filed a motion to exclude the opinions of Dr. Rice that were inconsistent with the Court's claim construction order (Dkt. 119), which the Court substantially granted. Dkt. 174 (excluding invalidity arguments regarding "wash area", "first line", and "second line", and non-infringement arguments regarding "rail system extending longitudinally over a wash area," "area into which the spray arm extends is not part of the wash area," and "predefined wash area"). There should have been no need for such a motion, as the Court had already explained in its claim construction decision why these defenses were not viable. Later, Belanger had to file a motion *in limine* (Dkt. 205) related to one of the defenses for which the Court had excluded Dr. Rice from offering testimony, "a rail system extending longitudinally over a wash area." Belanger asked WashWorld to withdraw this defense, and WashWorld refused; but after Belanger prepared and filed its motion; WashWorld withdrew it.

### iii.  WashWorld unsuccessfully challenged Dr. McDuff's damages opinions

WashWorld filed a 34-page *Daubert* motion to exclude Dr. McDuff's opinions (Dkt. 122), which the Court denied in full (Dkt. 173). To fully respond to the issues in WashWorld's motion, Belanger filed a 42-page opposition. Dkt. 130. Belanger had to first explain what Dr. McDuff said because WashWorld had badly mischaracterized his report. WashWorld had no reasonable basis for excluding Dr. McDuff's testimony. WashWorld misunderstood the application of the

17

entire market value rule in the context of lost profit damages. WashWorld asserted Dr. McDuff's market share analysis was based on an unreliable estimate, when it was not in fact based on that estimate. WashWorld asserted his testimony should be excluded because Dr. McDuff provided a range of damages calculations, ignoring Federal Circuit precedent allowing experts to provide a range. And WashWorld's other criticisms plainly went to the weight—and not admissibility—of Dr. McDuff's testimony. The Court did not exclude his testimony (Dkt. 173), and the jury accepted his damages calculation, awarding damages within his stated range.

### iv. WashWorld attempted to dismiss as moot its invalidity claims

WashWorld filed a motion to dismiss its invalidity claims as moot and without prejudice or costs. Dkt. 194. WashWorld had litigated and lost its invalidity claims, and it was not entitled to dismiss them and then refile them at a later time. Dkt. 198. But even though it should have been apparent to WashWorld that it could not dismiss these claims without prejudice, WashWorld still filed its motion and Belanger was required to prepare and file an opposition to the motion (Dkt. 198). The Court denied WashWorld's motion on the record at the telephone final pretrial conference, stating, "Those were dismissed as part of the summary judgment order if I recall correctly, and that will be part of the final judgment once all the claims are resolved." Dkt. 217 (2022-01-07 Hr'g Tr.) at 4:16–19; *see also* Dkt. 204.

### v. WashWorld filed a motion to reconsider summary judgment of non-infringement

Nearly four months after the Court issued its summary judgment decision, WashWorld filed an untimely motion for partial reconsideration of the Court's decision concerning the doctrines of ensnarement, claim vitiation, and prosecution history estoppel, necessitating additional briefing and expense. Dkt. 199, 200, 201. The Court denied WashWorld's motion because "no grounds in the record exist to reconsider the Court's decision." Dkt. 202 at 2.

18

***

These motions should not have been necessary. They are not the result of a vigorous defense, but rather the product of poorly-thought-out positions. WashWorld repeatedly advanced positions that had no legal support. Many of the issues were dealt with through attorney conference without the Court's assistance, but all increased the cost to litigate this matter.

### 4. The infringer's size and financial condition

WashWorld's financial condition weighs in favor of enhancement. The purpose of this factor is to ensure that an infringer is financially able to pay an enhanced damages award, and this factor also gives the Court an opportunity to evaluate the extent to which enhancement will serve as a deterrent for future conduct. *See, e.g.*, *Amsted*, 1993 WL 96517, at *3 (finding that, given the infringer's "characterization of the amount at issue as 'nominal,' an enhancement would not irreparably harm [the infringer] and is required for deterrent effect").

WashWorld is not a large, public company, but it is more than capable of paying an enhanced damages award. WashWorld refused to provide discovery in this case on its overall finances, but its financial condition can be inferred from the available information. WashWorld sold $19.3 million of the accused product in 2021 alone and sold $48 million of the accused product from 2018 through 2021. Trial Tr. at 422:1–5. WashWorld's overall finances are made up of sales of other products in addition to its sales of the accused product. Moreover, WashWorld's president said the $10,060,000 jury award and injunction were "No big deal." WashWorld has sufficient resources to pay the judgment and more. This factor weighs in favor of enhancement. *See, e.g.*, *Amsted*, 1993 WL 96517, at *3; *see also, e.g.*, *ReedHycalog UK, Ltd. v. Diamond Innovations Inc.*, No. 6:08-CV-325, 2010 WL 3238312, at *9–10 (E.D. Tex. Aug. 12, 2010) (awarding treble damages where *Read* Factor 4 was neutral).

19

### 5. Closeness of the case

WashWorld brought a declaratory judgment action seeking to have the '041 patent declared invalid, unenforceable, and not infringed. Dkt. 1 at Counts I and II. The validity and enforceability issues were extraordinarily weak and never made it to trial, and the jury quickly rejected WashWorld's non-infringement arguments and returned a verdict of willful infringement.

WashWorld asserted that the '041 patent was unenforceable because Belanger allegedly knew the patent was invalid and unenforceable. Dkt. 1 at ¶ 39. Leaving aside the circular logic, WashWorld had no evidence that Belanger knew the patent was invalid and unenforceable. Belanger subsequently defeated each of WashWorld's invalidity arguments—indeed, none of them even made it to trial.

WashWorld asserted the '041 patent was obvious and anticipated. It threated to file an *inter partes* review, but never did so. Its June 1, 2020, initial invalidity contentions asserted obviousness and anticipation based on five prior art references. None of these references disclosed the feature the USPTO found to be novel in awarding the '041 patent (lights extending the vertical length of the spray arm). Despite repeated requests from Belanger, WashWorld refused to explain how these references anticipated or rendered obvious the '041 patent, and said their expert would address these issues in his report. Ex. 3; Ex. 4. As a result, Belanger served discovery, asked questions about these issues at depositions, and discussed with Dr. Reinholtz these undefined prior art defenses. When the long-awaited expert disclosure arrived, Belanger learned that Dr. Rice did not agree with WashWorld, and that he would not be opining the patents were anticipated or obvious. Dr. Rice's Report at paragraph 34:

> I was provided with several prior art references and asked to comment concerning the disclosures and teachings of the prior art references. Specifically, I was asked to determine whether the prior art references anticipated and of the asserted claims of the 041 patent and if any of the prior art references rendered any of the asserted claims of the 041 patent obvious.

Ex. 1.  Although asked to provide an opinion on obviousness and anticipation, Dr. Rice's report does not disclose any such opinion.  WashWorld's obviousness and anticipation defenses were so deficient that its own expert did not support them.

WashWorld also asserted the patents were invalid under 35 U.S.C. § 112.  Its invalidity contentions disclosed § 112 arguments regarding the claim elements "wash area" and "predefined wash area."  Dr. Rice supported WashWorld's argument; but, his opinion was based on the wrong construction of wash area and predefined wash area, and his opinions was struck.  Dkt. 174 at 5.[4]

Before trial, WashWorld agreed to dismiss its invalidity claims.  Dkt. 194.  Although WashWorld filed a declaratory judgment claim of invalidity and unenforceability (Dkt. 1, Count I), those claims were so untenable that WashWorld could not muster a triable issue for either claim.

WashWorld's non-infringement contention regarding claim 7 was always based on an interpretation of the claim that is contrary to Federal Circuit precedent on how claims are to be read.  In the patent specification, one of the examples of a cushioning sleeve is made of foam.  WashWorld tried to read the claim term "cushioning sleeve" to mean "foam cushioning sleeve."  As noted above (*supra* at 8–9), this is antithetical to decades of Supreme Court and Federal Circuit precedent:  *Phillips*, *SRI*, *Markman*, *Smith*.  WashWorld and its patent counsel should have known from the outset that this argument was untenable.  Indeed, the jury rejected WashWorld's argument that it had a good faith basis for believing it did not infringe.

_____

[4] Dr. Rice also asserted a § 112 argument based on the first and second lines.  This was a previously undisclosed theory.  Ex. 5 (WashWorld's June 1, 2020, invalidity contentions) ("Washworld does not have any additional disclosures of invalidity based on indefiniteness under 35 U.S.C. § 112(2) or enablement or written description under 35 U.S.C. § 112(1) at this time.").  Dr. Rice wrongly claimed the lines of lights and nozzles were not disclosed, when they are depicted in Figures 1 and 2.  The Court readily denied both theories of indefiniteness in its claim construction decision (Dkt. 109 at 5, 13–14) and struck Dr. Rice's opinions (Dkt. 174 at 6).

Moreover, there can be no doubt that this argument was untenable once the Court issued its claim construction order. Dkt. 109 at 9–10 ("Although Wash World invites the Court to rely on the intrinsic evidence to narrow these terms, '[c]onsulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of [the] precedent counseling against importing limitations into the claims.'"). Yet, WashWorld refused to concede infringement under the Court's claim construction. WashWorld continued to assert it did not have a cushioning sleeve and asserted that the infringing products did not have two of the three elements of claim 7 that it had previously admitted were present.

At trial, WashWorld did not call its expert to support its non-infringement defenses. WashWorld spent most of its trial time on issues that were not relevant to whether it infringed. It did not present evidence that the LumenArch did not have a protective sleeve. Indeed, Mr. Heino's internal memorandum had told WashWorld that the blue sleeve was a protective sleeve. In her closing argument, Ms. Coley did not reference ***any*** evidence presented at trial that the blue plastic sleeve was not a cushioning sleeve. Trial Tr. 863:8–865:13. She simply asked the jury to "determine if the blue arch cover does, in fact, meet the limitations of this claim." *Id*. at 864:22–23. The jury found that it did, and quickly returned a verdict for Belanger.

This case was not close. WashWorld brought the case in its hometown, not because it sought validation of its non-infringement positions, but because it was concerned that Belanger was going to sue it first, in the court of Belanger's choice. As reflected in its internal correspondence with counsel, WashWorld initially hoped to intimidate Belanger into going away. When Belanger did not go away, WashWorld sent a letter saying it would get back to Belanger, to discourage Belanger from filing suit first. Meanwhile, WashWorld was not preparing a responsive

letter, but was instead preparing to file its own complaint in its preferred venue. Belanger beat WashWorld in its preferred venue, and the case was not close. WashWorld had the burden of proof on Count I of its declaratory judgment complaint and lost before trial, and the jury quickly found for Belanger—and against WashWorld—on the issue of infringement. The Court should find this *Read* factor supports enhancing the damages. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 52 (finding that the case "was not close" where "the jury reached a verdict in about two hours," noting that "[o]ther courts have assessed enhanced damages, in part, because of how quickly the jury reached their verdict," and awarding treble damages).

### 6. Duration of the infringer's misconduct

WashWorld's infringement of the '041 patent from 2018 through the present weighs in favor of enhancement. *Read*, 970 F.2d at 827; *EagleView*, 522 F. Supp. 3d at 52–54. Rather than abandon or modify its LumenArch, WashWorld continued selling it for four years. WashWorld forced Belanger to win at trial and obtain an injunction. Where, as here, infringement has lasted for years, some courts look to whether the infringer had a good-faith belief of non-infringement or invalidity that would justify its decision not to end the infringement sooner. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 52–54 (collecting cases). The jury has answered that question, rejecting WashWorld's argument that its reliance on counsel was reasonable.

WashWorld originally ignored Belanger's patent—even though it had reason to know of it. When Belanger notified WashWorld of the patent, it refused to stop selling the LumenArch. It claimed at trial that it relied on the advice of its attorney that it did not infringe—however, the jury found that reliance was not reasonable and found that WashWorld willfully infringed the patent. WashWorld did not design around the '041 patent or take the accused products off the market, even after the Court rejected WashWorld's proposed claim constructions, which meant that WashWorld had no legitimate defense to claim 7 of the '041 patent. And it was not until after

23

Belanger requested an injunction, and the Court stated it would likely grant an injunction (Trial Tr. 887:16–17) that WashWorld took steps to stop selling the LumenArch.

WashWorld continued to sell the LumenArch for four years, and during that time, WashWorld made serious inroads into Belanger's market share. Trial Tr. 423:2–19. WashWorld continues to benefit from its past infringement because it continues to market and sell under its Razor EDGE package name—a package that initially gained market awareness through heavy emphasis on the LumenArch—even though it can no longer sell the LumenArch as part of that package. The fact that WashWorld enjoyed the benefits of is infringement of the '041 patent for four years supports enhancement. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 52–53 (finding that "this factor favors enhancement" where the infringer "continued to infringe from the time they received a notice of infringement . . . until the Court enjoined [the infringer] post-verdict," and awarding treble damages); *Monsanto*, 2017 WL 4284566, at *5 (finding that "[t]he egregiousness of [the infringer's] prolonged infringement" supported "a damages enhancement of three times the total compensatory damages amount").

### 7.     Remedial action by the infringer

*Read* Factor 7 asks whether the infringer took "[r]emedial action." *Read*, 970 F.2d at 827; *see also R-BOC*, 233 F. Supp. 3d at 683–84, 687–89. Here, as explained above, WashWorld took no remedial measures until after the Court indicated it would issue an injunction. This decision came from the top. Even after Belanger notified WashWorld of its infringement, WashWorld's president (Jensen) authorized the continued sale of the infringing products: Trial Tr. at 593:4–9.

Even after the jury's verdict, WashWorld did not make any changes to its advertising or websites until after the Court issued its injunction on August 9, 2022, and until after Belanger complained of WashWorld's continuing promotion of the LumenArch on August 10, 2022. Ex. 6. WashWorld's continued infringement of the '041 patent and failure to take remedial action

24

weigh in favor of enhancement. *See, e.g.*, *EagleView*, 522 F. Supp. 3d at 54 (finding that "this factor favors enhancement" where the infringer "continued to infringe, seemingly took no efforts to design around the patent, and kept their products on the market until the very end," and awarding treble damages); *Stryker*, 2017 WL 4286412, at *5 (finding that "the seventh factor favored enhancement because [the infringer] failed to take any remedial action to stop infringement or mitigate damages at any point in time, including during the two-plus years covered by [the] litigation," and awarding treble damages); *R-BOC*, 233 F. Supp. 3d at 683–84, 687–89 (awarding treble damages where the infringer "deliberately and slavishly copied" the patentee's product and failed to make changes to its product).

### 8. The infringer's motivation for harm

*Read* Factor 8 concerns the infringer's motivation for harm. *Read*, 970 F.2d at 827. This factor is neutral. *See, e.g.*, *ReedHycalog*, 2010 WL 3238312, at *9–10 (awarding treble damages where *Read* Factor 8 was neutral).

### 9. Whether the infringer attempted to conceal its misconduct

*Read* Factor 9 concerns whether the infringer "attempted to conceal its misconduct." *Read*, 970 F.2d at 827. While WashWorld was brazen in its copying and infringement, it sought to conceal that its attorney, Mr. Heino, was telling WashWorld something different than what he was telling Belanger. As discussed *supra* at 8–10, the letter that Mr. Heino sent to Belanger was not an objective opinion of counsel; it was an advocacy piece. Mr. Heino's internal memoranda and correspondence between Mr. Heino and WashWorld show that Mr. Heino harbored concerns about the positions he put in letters to Belanger. Throughout this litigation, however, WashWorld tried to rely on Mr. Heino's advocacy piece as an opinion of counsel and conceal Mr. Heino's objective opinion of the merits of the positions in that letter. WashWorld did not produce any of this internal correspondence until the last day of fact discovery, August 14, 2020 (Dkt. 23), after its witnesses

25

were deposed—including its designated witness on Topic No. 52: "Any opinions of counsel you intend to rely on in this litigation." Ex. 7 (2020-07-29 Andreas Dep. Tr. at 22:3–7). WashWorld's attempt to conceal the objective opinion of its purported opinion counsel weighs in favor of enhancement. *See, e.g.*, *Stryker*, 2017 WL 4286412, at *6 (finding that "the ninth factor favored enhancement" where "although [the infringer] did not attempt to hide the entirety of its misconduct, it did attempt to prevent [the patentee] from discovering certain aspects of its infringement in the run-up to trial," and awarding treble damages).

***

The Court has discretion to award any amount of enhanced damages up to treble damages. The *Read* Factors overwhelmingly favor a trebling of compensatory damages in this case. *See, e.g.*, *Monsanto*, 2017 WL 4284566, at *5 (awarding treble damages where the infringer "knew of the patent protection" and copied the patentee's technology and the infringement was "prolonged"); *R-BOC*, 233 F. Supp. 3d at 683–84, 687–89 (awarding treble damages where the infringer "deliberately and slavishly copied" the patentee's product and failed to make changes to its product); *Amsted*, 1993 WL 96517, at *2–3 (awarding treble damages where the infringer "intentionally copied the patented article," the infringer "advanced the defense of reliance on opinion of counsel to the jury" and "the jury did not find for" the infringer, and given the infringer's "characterization of the amount at issue as 'nominal,' an enhancement would not irreparably harm [the infringer] and is required for deterrent effect").

## IV.  THIS IS AN EXCEPTIONAL CASE AND THE COURT SHOULD AWARD BELANGER ITS ATTORNEY FEES UNDER 35 U.S.C. § 285

"A court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An exceptional case "stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the

26

case) or the unreasonable manner in which the case was litigated." *SRI Int'l, Inc. v. Cisco Systems, Inc.*, 14 F.4th 1323, 1331 (Fed. Cir. 2020). Courts determine whether a case is exceptional based on "the totality of the circumstances," and the preponderance of the evidence standard applies. *Octane*, 572 U.S. at 557–58. Belanger seeks $1,884,847 in attorney fees.

### A.    This Case Is Exceptional Because the Jury Found It To Be Exceptional

Although the jury was not asked to consider whether attorney fees are warranted, *sua sponte* the jury asked the Court "[h]ow can we add additional charges to Washworld for . . . lawyer fees. . . ." Dkt. 223-1. This is the first time counsel has ever heard of such a request by a jury. Unsolicited, the jury believed that WashWorld should have to pay Belanger's attorney fees and costs. This alone makes the case stand out from others.

### B.    A Finding of Willfulness Warrants an Award of Attorney Fees

The jury found that WashWorld willfully infringed the '041 patent. The Court may award attorney fees on this basis alone. "While a finding of willful infringement does not require a finding that a case is exceptional, [Federal Circuit] cases uniformly indicate that the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case exceptional for purposes of awarding attorney fees to the prevailing patent owner." *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir. 2004); *see also Deckers Outdoor Corp. v. Australian Leather Pty. Ltd.*, No. 16 CV 3676, 2020 WL 4723980, at *7 (N.D. Ill. July 13, 2020) ("Willfulness alone can justify an exceptional-case finding . . ."), *aff'd*, 847 F. App'x 917 (Fed. Cir. 2021); *Georgetown Rail Equipment Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 WL 3346084, at *22 (E.D. Tex. June 16, 2016) (jury willfulness determination "alone is a 'compelling' indication that this is an exceptional case"), *aff'd*, 867 F.3d 1299 (Fed. Cir. 2017).

27

### C. WashWorld's Liability Defenses Were Exceptionally Weak

WashWorld's exceptionally weak merits positions, discussed *supra* at §§ III.C.3 and III.C.5, also justify the award of attorney fees in this case. *Cognex Corp. v. Microscan Systems, Inc.*, No. 13-cv-2027 (JSR), 2014 WL 2989975, at *4 (S.D.N.Y. June 30, 2014) (finding case exceptional where "the defenses that were offered at trial were particularly weak").

In particular, attorney fees are appropriate given WashWorld's pursuit of its meritless non-infringement defense after claim construction. *See Cambrian Science Corp. v. Cox Communications, Inc.*, 79 F. Supp. 3d 1111, 1115–16 (C.D. Cal. 2015) (finding case exceptional where the litigation position became untenable as a result of claim construction ruling); *Linex Technologies, Inc. v. Hewlett-Packard Co.*, No. C 13-159 CW, 2014 WL 4616847, at *3–5 (N.D. Cal. Sept. 15, 2014) (same). In rejecting WashWorld's legal opinion defense, the jury implicitly found that—from the outset—WashWorld did not have a reasonable belief that it did not infringe claim 7. WashWorld's non-infringement defense for claim 7 was dead on arrival, and the Court's claim construction order put the nails in the coffin. The Court rejected WashWorld's attempt to import the foam limitation into claim 7. Dkt. 109 at 10. If WashWorld genuinely believed the Court erred in its construction, it could have admitted infringement under the Court's construction and appealed that decision. It did not do so. Undoubtedly because the Federal Circuits case law (*supra* at 8–9) rejects reading elements found in the specification into the claims. Instead, WashWorld doubled down and claimed the LumenArch did not have a protective sleeve—when its patent attorney had told them it had one before they filed this lawsuit.

### D. WashWorld's Litigation Tactics Needlessly Increased Costs

As discussed (*supra* at § III.C.3), WashWorld's litigation tactics were unreasonable and needlessly increased litigation costs for Belanger. This too provides a basis to award attorney fees. *See Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013)

("[A]n overall vexatious litigation strategy and numerous instances of litigation misconduct are sufficient to support an exceptional case determination."). WashWorld is permitted to vigorously defend itself, and the fact it lost does not make this case exceptional. What makes this case exceptional is that WashWorld repeatedly took unreasonable positions that required Belanger and the Court to intervene (e.*g*., not dismissing Dover, refusing to produce financial and technical discovery, not dropping untenable defenses) and changed its arguments—sometimes contradicting its prior sworn testimony. *Oplus Technologies, Ltd. v. Vizio, Inc.*, 782 F.3d 1371, 1374 (Fed. Cir. 2015) ("Defending against a constantly moving target would logically have increased the expense of litigation[.]"); *Pure Fishing, Inc. v. Normark Corp.*, No. 10-cv-2140-CMC, 2014 WL 5474589, at *5 (D.S.C. Oct. 28, 2014) ("shifting positions resulted in an unwarranted increase in the expense of litigation"); *Georgetown Rail*, 2016 WL 3346084, at *24 (finding case exceptional where the party "continue[d] to raise rejected arguments that [were] found to be objectively unreasonable").

### E.     Belanger Should Be Awarded $1,884,847

The Dillon Declaration explains the amount of attorney fees that Belanger expended in this case. With the exception of the most recent monthly invoices, this amount comprises the amount that Fish & Richardson invoiced to Belanger and which Belanger fully paid. *See T&M Inventions, LLC v. Acuity Brands Lighting, Inc.*, No. 14-C-947, 2016 WL 7441650, at *2 (E.D. Wis. Dec. 27, 2016) (Griesbach, J.) ("[T]he best evidence of whether attorney's fees are reasonable is whether a party has paid them." (quoting *Cintas Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008))). The amount expended is reasonable, and the Court should award Belanger $1,884,847.

## V.     THE COURT SHOULD AWARD PREJUDGMENT INTEREST

"[P]rejudgment interest should ordinarily be awarded absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). A prevailing patent holder is entitled to "damages adequate to compensate for infringement . . .

29

together with interest and costs as fixed by the court." 35 U.S.C. § 284. District courts in the Seventh Circuit have routinely awarded prejudgment interest at the prime rate. *See, e.g.*, *Wisconsin Alumni Research Foundation v. General Electric Co.*, 880 F. Supp. 1266, 1278 (E.D. Wis. 1995).

Belanger's damages expert, Dr. McDuff, has prepared a declaration to assist the Court in setting the proper amount of prejudgment interest. Declaration of DeForest McDuff, Ph.D in Support of Belanger's Motion for Prejudgment Interest. As described in his declaration, Dr. McDuff calculates prejudgment interest using the Bank Loan Prime Rate as published by the St. Louis Federal Reserve, which is used for bank borrowing and represents a lower-end commercial lending rate. *Id.* at ¶ 2. He calculates the effective judgment in each year based on the 20% lost profit scenario he presented at trial, which corresponds to the amount awarded by the jury. *Id.* at ¶ 3. He then calculates interest based on a standard mid-year sales convention. *Id.* This methodology yields a total prejudgment interest of $702,317. *Id.* at ¶ 4.

## VI.    CONCLUSION

For these reasons, Belanger respectfully requests that the Court (1) treble the jury's damages award of $10,060,000 to $30,180,000, (2) award Belanger its reasonable attorney fees in the amount of $1,884,847, and (3) award prejudgment interest in the amount of $702,317.

Dated:  August 23, 2022                          FISH & RICHARDSON P.C.

                                     By:  */s/ Christopher R. Dillon*
                                          Christopher R. Dillon
                                          Whitney A. Reichel
                                          FISH & RICHARDSON P.C.
                                          One Marina Park Drive
                                          Boston, MA 02210-1878
                                          Tel:  (617) 542-5070
                                          Fax: (617) 542-8906

                                     Attorneys for BELANGER, INC.